**Ruth M. EVERSOLE, Plaintiff–Appellant,**

v.

**Harold STEELE, In His Official Capacity as Sheriff of Fayette County, Indiana, George Zimmerman, as Former Sheriff of Fayette County, Indiana and Individually; Joseph Todd, Individually and in His Official Capacity as Lieutenant Detective of the Connersville, Indiana Police Department, et al., Defendants–Appellees.**

No. 94–2622.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 13, 1995.

Decided July 14, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 16, 1995.

712

Frank W. Hogan (argued), Symmes, Voyles, Zann, Paul & Hogan, Indianapolis, IN, for plaintiff-appellant.

Robert T. Keen, Jr. (argued), Diana C. Bauer, Miller, Carson, Boxberger & Murphy, Fort Wayne, IN, for Harold Steele, George Zimmerman and Ted McQuinley.

George E. Purdy, Alan S. Townsend, Bose, McKinney & Evans, Indianapolis, IN, Robert T. Keen, Jr., Miller, Carson, Boxberger & Murphy, Fort Wayne, IN, for Joseph Todd and Dennis Sherck.

Robert W. Geddes, Hume, Smith, Geddes & Green, Indianapolis, IN, for Tom Helms.

Philip Linnemeier, Kightlinger & Gray, Indianapolis, IN, for Lee Davidson.

Before COFFEY and KANNE, Circuit Judges, and MORAN, District Judge.[*]

COFFEY, Circuit Judge.

Ruth M. Eversole filed suit under 42 U.S.C. § 1983 against the sheriffs of Rush, Union, Fayette and Franklin Counties, Indiana, and the arresting officers and co-directors of a four-county drug enforcement task force operating in the above listed counties, alleging that they unlawfully arrested her in violation of her right to be free from arrest without probable cause under the Fourth and Fourteenth Amendments to the United States Constitution. Eversole alleges that the defendants mistakenly determined, based on the handwritten records of two pharmacies, that she had made two purchases of codeine-containing cough syrup within a forty-eight hour period, in violation of Indiana Code § 35–48–4–7(b).[1] The district court granted summary judgment in favor of the police officers involved in the arrest, finding that the actions of Detectives McQuinley and Sherck were not taken pursuant to an unconstitutional policy as required for a successful § 1983 claim against a governmental entity and that the officers were entitled to qualified immunity from suit. We affirm.

## I. FACTUAL BACKGROUND

### A. Eversole's Purchases of Schedule V Controlled Substances

On April 5, 1988, Ruth Eversole, a 54–year–old woman, is alleged to have purchased four ounces of cough syrup containing codeine from Thielking Drug Store in Connersville, Fayette County, Indiana. Then, on April 8, 1988, she is alleged to have made a second purchase of cough medicine containing codeine, this time from Hooks Drugs in Liberty, Fayette County, Indiana. Each of these two drug stores, pursuant to Indiana statute, maintained a handwritten record of

[*] Hon. James B. Moran, Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. Ind.Code § 35–48–4–7(b) provides in pertinent part:

 A person who, without a valid prescription or order of a practitioner acting in the course of his professional practice, knowingly or intentionally obtains: (1) More than four (4) ounces

of schedule V controlled substances containing codeine in any given forty-eight (48) hour period unless pursuant to a prescription; ... commits a Class D felony.

Any "compound, mixture, or preparation containing ... [n]ot more than 200 milligrams of codeine per 100 milliliters or per 100 grams" is classified as a schedule V controlled substance. Ind.Code § 35–48–2–12.

sales of schedule V controlled substances, which listed the name and address of each purchaser, the date of the purchase, as well as the type and quantity of the cough medicine containing narcotics sold, and the initials of the person who recorded the sale. *See* 856 Ind.Admin.Code § 2–6–18(a)(5). As each sale occurred, the pharmacist or salesperson recorded this information in writing.

Eversole's purchase from Thielking Drug Store was entered on the second line of its log, which recorded the sales which occurred in the time period between April 4, 1988 and April 13, 1988. The pharmacist's handwritten date of Eversole's purchase was marginally legible, and could have been interpreted as either April 5, 1988 or April 8, 1988. The entry on the first line reflected a sale occurring on April 4, 1988 and the entry on the third line reflected a sale occurring on April 6, 1988. Eversole's purchase from Hooks Drugs was entered on the third line of its log, which recorded sales which occurred between April 4, 1988 and April 22, 1988. The handwritten date of Eversole's purchase on Hooks's log, as contrasted with the date on Thielking's log, was legible: April 8, 1988.

B. *The RUFF Drug Task Force and Eversole's Arrest*

In 1988, law enforcement officials from four Indiana counties, including Rush, Union, Fayette and Franklin Counties, and several municipalities within those counties, formed a task force to combat the ever increasing drug trafficking and use of illegal narcotics. Detective Lieutenant Ted McQuinley of the Fayette County Sheriff's Department and Detective Captain Dennis Sherck of the Connersville Police Department served as co-directors of the RUFF Drug Task Force, which also received support from the police departments in Connersville and Rushville.

In 1989, the RUFF Drug Task Force began a comprehensive investigation of violations of Indiana Code § 35–48–4–7(b), which prohibits the purchase of more than four ounces of schedule V controlled substances containing codeine used in cough syrup within any given forty-eight hour period. *See supra* n. 1. As part of this investigation, RUFF's investigating officers inspected copies of schedule V controlled substances sales records from drug stores and pharmacies in the four-county area, including the records of Thielking Drug Store and Hooks Drugs.

Detective McQuinley, along with other members of RUFF, reviewed the sales records, and transcribed the date of each purchase as well as the purchaser's name on a blank calendar. As noted above, the entry of the date recorded on the log of Eversole's purchase of codeine-laden cough syrup from Thielking Drug Store was unclear, and McQuinley mistakenly interpreted her April 5, 1988 purchase from Thielking Drug Store as having occurred on April 8, 1988, the same date as her purchase of cough syrup containing codeine from Hooks Drugs.

Based on the dates and purchases he transcribed from the pharmacy records to his calendar, McQuinley concluded that Eversole had purchased more than four ounces of a schedule V controlled substance containing codeine within a forty-eight hour period in violation of Indiana Code § 35–48–4–7(b). On June 3, 1989, the Deputy Prosecutor of Fayette County, Indiana, filed an Information charging Eversole with Possession of a Controlled Substance, which stated:

> Affiant herein, being duly sworn upon oath, says on information and belief that Ruth Eversole, on or about 4/8/88 and 4/8/88 at the County of Fayette in the State of Indiana, without a valid prescription or order of a practitioner acting in the course of his professional practice, knowingly or intentionally obtained more than 4 ounces of Schedule V controlled substances containing Codeine in a (48) hour period, all of which is contrary to the form of the statute in such cases made and provided, to-wit Indiana Code 35–48–4–7(b), and against the peace and dignity of the State of Indiana.

> The material witnesses for the State are: Detective Capt. Dennis Sherck, CPD and Det. Lt. Ted McQuinley, FCSD.

Detective Sherck executed and presented an Affidavit of Probable Cause charging Eversole with the illegal purchases of schedule V controlled substances to Fayette County Superior Court Judge Louis Heeb who, after

reviewing the same, issued a bench warrant for Eversole's arrest on June 13, 1989.

On June 13, 1989, Deputy Joe Jarman of the Rush County Sheriff's Department, along with four other officers,[2] served Eversole with the bench warrant at her home in Connersville, Indiana. After Deputy Jarman read the bench warrant to Eversole, who was suffering from a heart malady, she informed him that she felt ill and needed a heart patch. The arresting officers allowed Eversole to put on a heart patch and drink a glass of lemonade while she rested on her porch. After composing herself, Eversole was escorted, without handcuffs, by the police to the Connersville Police Station where she was fingerprinted, photographed, and booked on the charge of unlawful possession of schedule V controlled substances containing codeine. Shortly thereafter she was transferred to the County Jail, and released by the police on a $200 bond.

Eversole entered a plea of not guilty at her initial appearance. Thereafter she contacted the pharmacist at Thielking Drug Store concerning her arrest and he explained that the handwritten entry on Thielking's records which appeared to be April 8, 1988 was actually April 5, 1988. When the prosecutor learned of this information, he moved the court and the court granted the motion to dismiss the criminal charge against Eversole.

### C. Eversole's 42 U.S.C. § 1983 Claim

On June 12, 1991, Eversole filed a complaint under 42 U.S.C. § 1983 against twelve law enforcement officers, including members of the RUFF Drug Task Force and the sheriffs of Rush, Union, Fayette and Franklin Counties, Indiana, alleging that they unlawfully arrested her in violation of her right to be free from arrest without probable cause. After a hearing, the district court dismissed, with prejudice, the complaint as against three of the defendants, and granted summary judgment in favor of the remaining nine defendants, finding that the actions of

Detectives McQuinley and Sherck were not taken pursuant to an unconstitutional policy as required for a successful § 1983 claim against a governmental entity and also that the officers were entitled to qualified immunity from suit.[3] On appeal, Eversole challenges the district court's ruling with respect to two of the defendants, Detective McQuinley of the Fayette County Sheriff's Department and Detective Sherck of the Connersville Police Department.

## II. DISCUSSION

Eversole raises two issues on appeal. First, she claims that the district court erred when it found that the actions of Detectives McQuinley and Sherck were not taken pursuant to an unconstitutional policy as required for a successful § 1983 claim against a governmental entity. Second, she asserts that the district court erred in finding that the officers were entitled to qualified immunity from suit.

### A. Standard of Review

We review the district court's decision to grant summary judgment *de novo*. *NLFC, Inc. v. Devcom Mid–America, Inc.*, 45 F.3d 231, 234 (7th Cir.1995), *cert. denied*, —— U.S. ——, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995). Summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "When determining if a genuine issue of material fact exists, all facts must be construed in the light most favorable to the party opposing the motion and the court must draw all inferences in favor of that party." *NLFC, Inc.*, 45 F.3d at 234; *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

**2.** The four other officers included one from the Rushville Police Department, one from the Fayette County Sheriff's Department, and two Eversole believed were from the Union County Sheriff's Department. Neither Detective McQuinley nor Detective Sherck participated in Eversole's arrest.

**3.** The court dismissed Eversole's state law claims against all of the defendants without prejudice.

242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986).

### B. *The Policymaking Authority of Detectives McQuinley and Sherck as Co-Directors of the RUFF Drug Task Force*

■ In *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court ruled that local governmental bodies could not be held liable under 42 U.S.C. § 1983 "simply because they employed the tortfeasor acting within the scope of his or her employment." *Cornfield v. Consolidated High School Dist. No. 230,* 991 F.2d 1316, 1324 (7th Cir.1993) (citing *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38); *McNabola v. Chicago Transit Authority,* 10 F.3d 501, 509 (7th Cir.1993) (well-established caselaw prohibits the imposition of § 1983 liability against a local governmental entity under a theory of *respondeat superior* ). Rather, "[m]unicipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional torts of their agents." *Auriemma v. Rice,* 957 F.2d 397, 399 (7th Cir.1992).

■ *Monell* and its progeny stand for the proposition that a local governmental entity will be responsible for the unconstitutional actions of its employees only if those actions were taken pursuant to official policy or custom. *See Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 735–36, 109 S.Ct. 2702, 2722–23, 105 L.Ed.2d 598 (1989) (to prevail on a § 1983 claim, a plaintiff must establish that the state actor's constitutional tort "was caused by a custom or policy"); *St. Louis v. Praprotnik,* 485 U.S. 112, 122, 108 S.Ct. 915, 923–24, 99 L.Ed.2d 107 (1988) ("[local] governments should be held responsible when, and only when, their official policies cause their employees to violate another

person's constitutional rights"); *Pembaur v. Cincinnati,* 475 U.S. 469, 478–80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) ("recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered"); *see also James v. Milwaukee County,* 956 F.2d 696, 700 n. 4 (7th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 63, 121 L.Ed.2d 31 (1992) ("a 'pattern' of activity by state actors must be shown to infer that a policy existed"). The Supreme Court has held that "municipal liability [under § 1983] may be imposed for a *single* decision by municipal policymakers under appropriate circumstances." *Pembaur,* 475 U.S. at 480, 106 S.Ct. at 1299 (emphasis added).[4] However, not every action taken by employees with decisionmaking authority gives rise to the potential for liability:

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.... The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

*Pembaur,* 475 U.S. at 481–83, 106 S.Ct. at 1299–1300 (citations and footnotes omitted).

■ We are called upon to decide whether Detectives McQuinley and Sherck, while acting in their official capacities as members of the RUFF Drug Task Force and as law enforcement officers within their own respective jurisdictions, possessed "final policymaking authority" with respect to the investigation and subsequent arrest of Eversole.[5] Policymaking authority "may be

---

4. "[A] government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur,* 475 U.S. at 481, 106 S.Ct. at 1299 (footnote omitted).

5. Eversole argues that whether McQuinley and Sherck possessed final policymaking authority with respect to the activities of the RUFF Drug Task Force is a factual issue for a jury to decide. This argument is contrary to Supreme Court precedent. "[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the

granted directly by a legislative enactment or may be delegated by an official who possesses such authority." *Id.* at 483, 106 S.Ct. at 1300. "[W]hether a particular official has 'final policymaking authority' is a question of *state law."* *Praprotnik,* 485 U.S. at 123, 108 S.Ct. at 924. State or local law "will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Id.* at 125, 108 S.Ct. at 925; *see also Auriemma,* 957 F.2d at 400.

The law enforcement officers involved in the RUFF Drug Task Force, including Detectives McQuinley and Sherck, were acting pursuant to the rules and regulations of their respective law enforcement agencies, in this instance the Fayette County Sheriff's Department and the Connersville Police Department but were *not* acting pursuant to any policies established by the RUFF Drug Task Force. The RUFF Drug Task Force was simply a multi-jurisdictional effort of law enforcement agencies joined together in a coordinated effort to stop or at least control drug activity in the four-county area. Each participant in the Task Force remained obliged to follow the rules and regulations of his or her respective law enforcement agency.[6] Thus, *Jett* directs our inquiry: based on applicable state and local law, we must "identify those officials ... who speak with final policymaking authority" for Detectives McQuinley and Sherck concerning their RUFF Drug Task Force activities. *Jett,* 491 U.S. at 737, 109 S.Ct. at 2723–24.

■ We recognize that "identifying those vested with the authority to make policy is no mean feat." *Cornfield,* 991 F.2d at 1325. Nonetheless, our review of Indiana law reveals that the county sheriff is the final policymaker for law enforcement in his or her particular jurisdiction. *See Delk v. Board of Commissioners,* 503 N.E.2d 436,

440 (Ind.App.1987); *see also* Ind.Code §§ 36–2–13–1 to 36–2–13–14 (Burns 1994). Similarly, a police chief in Indiana is the final policymaker for his municipal police department. *See* Ind.Code § 36–8–3–3(g) (Burns 1994) ("[t]he police chief has exclusive control of the police department"); *id.* at § 36–8–3.5–11.[7] Although, as Eversole notes, McQuinley and Sherck held positions of authority within their respective law enforcement departments and as co-directors of the RUFF Drug Task Force, nothing in the record suggests that either was vested with *policymaking authority.* The discretion to make final decisions to carry out the policies of a local law enforcement entity does not equate to policymaking authority.

> *Monell's* effort to limit municipal liability under § 1983 to acts that carry out local policy entails distinguishing legislative from executive functions—a distinction always present in principle even though blurry in practice. "[R]esponsibility for making law or setting policy"—the objective under *Praprotnik* of our search through local law—is authority to adopt rules for the conduct of government. Authority to make a final decision need not imply authority to establish rules.

*Auriemma,* 957 F.2d at 401; *see also Cornfield,* 991 F.2d at 1325 ("[t]he exercise of discretion by a particular official, standing alone, does not give rise to municipal liability"). Detectives McQuinley and Sherck followed and implemented the policies of their respective law enforcement agencies through the cooperative mechanism of the RUFF Drug Task Force. The scope of their authority was limited to executing their responsibilities as law enforcement officers in accordance with federal, state, and local laws within their respective jurisdictions. Neither McQuinley nor Sherck had policymaking authority within the meaning of *Monell* and its progeny.

---

case is submitted to the jury." *Jett,* 491 U.S. at 737, 109 S.Ct. at 2724.

**6.** The RUFF Drug Task Force was not an official entity and thus had not promulgated policies, rules or regulations of its own regarding the law enforcement activities of its members.

**7.** Our holding that, under Indiana law, the county sheriff and chief of police in their respective positions are the final policymakers for law enforcement officials in their respective departments, is consistent with our holdings in other cases. *See, e.g., Zook v. Brown,* 865 F.2d 887, 895 (7th Cir.1989) (county sheriff in Illinois had final policy making authority with respect to discipline within the Sheriff's Department).

That the RUFF Drug Task Force had no formal rules or regulations of its own is of no concern. *See Cornfield,* 991 F.2d at 1325 ("the absence of a written policy is not enough to support an inference that final policymaking authority has been delegated to a subordinate"). We recognize that "in situations that call for procedures, rules, or regulations, the failure to make a policy itself may be actionable." *Id.* at 1326. However, this situation, *i.e.,* the operation of the RUFF Drug Task Force, was not one calling for its own procedures, rules, or regulations. Because the Task Force was nothing more than a joint effort of four counties in the State of Indiana to implement existing law enforcement policies, no new or unique policies were needed.

### C. *Qualified Immunity*

 Eversole also argues on appeal that the district court erred in granting summary judgment in favor of the defendants McQuinley and Sherck based on qualified immunity. A government official who, while acting under color of state law, deprives an individual of constitutionally protected rights may be subject to personal liability for civil damages. *See* 42 U.S.C. § 1983. However, "[t]he defense of qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Marshall v. Allen,* 984 F.2d 787, 791 (7th Cir.1993) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Qualified immunity is "a powerful shield that insulates [government] officials from suit." *Gregorich v. Lund,* 54 F.3d 410, 413 (7th Cir.1995); *see also Maltby v. Winston,* 36 F.3d 548, 554 n. 6 (7th Cir.1994), *cert. denied,* ── U.S. ──, 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995) (qualified immunity "is not merely a defense to liability but an immunity from suit"). When a defendant raises the defense of qualified immunity, this court engages in a two-part, objective inquiry: the court must determine (1) whether the plaintiff has asserted a violation of a federal constitutional right, and (2) whether the constitutional standards implicated were clearly established at the time in question. *Kernats v. O'Sullivan,* 35 F.3d 1171, 1176 (7th Cir.1994).[8] "The first part of this two-part test 'is a threshold issue that can defeat entirely a claim of qualified immunity. If a plaintiff's allegations, even when accepted as true, do not state a cognizable violation of constitutional rights, then the plaintiff's claim fails.'" *Zorzi v. Putnam,* 30 F.3d 885, 892 (7th Cir.1994) (quoting *Marshall,* 984 F.2d at 793). Although qualified immunity is often raised as a defense to a § 1983 action, it is the plaintiff who bears the burden of proof on the above two-part test. *Rakovich,* 850 F.2d at 1209.

 Eversole asserts that Detectives McQuinley and Sherck violated her Fourth Amendment right to be free from arrest without probable cause because their misinterpretation of the date of her purchase of cough syrup from Thielking Drug Store was the result of plain incompetence. We disagree. "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). Qualified immunity will shield a police officer from § 1983 liability if "'a reasonable officer could have believed [the plaintiff's arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.'" *Hunter,* 502 U.S. at 227, 112 S.Ct. at 536 (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). "'If a case involves a question of whether probable cause existed to support an officer's actions, the case should not be permitted to go to trial if there is any reasonable basis to conclude that prob-

---

8. We have consistently held that "the issue of qualified immunity is a legal question for the trial court, not the jury. Although the qualified immunity determination is a legal question it is not answered in the abstract but in reference to the particular facts of the case." *Rakovich v. Wade,* 850 F.2d 1180, 1201–02 (7th Cir.) (*en banc*), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988) (citations and footnotes omitted).

able cause existed.'" *McDonnell v. Cournia*, 990 F.2d 963, 968 (7th Cir.1993) (quoting *Cross v. Des Moines*, 965 F.2d 629, 632 (8th Cir.1992)).

Detective McQuinley, in the performance of his lawful duties as a member of the RUFF Drug Task Force, mistakenly determined that Eversole had made two purchases of codeine-containing cough syrup on April 8, 1988. His error stemmed from the marginally legible handwritten log maintained at Thielking Drug Store. In preparing and executing an Affidavit of Probable Cause, Detective Sherck relied on McQuinley's reading and interpretation of the entries made on the pharmacy records pursuant to Indiana law. *See* 856 Ind.Admin.Code § 2–6–18(a)(5). We agree with the district court that the less than perfect pharmacy record itself provided a reasonable basis for the officers to believe that probable cause existed. As explained by Judge Dillin:

> The handwriting in which the date was entered reasonably could be construed as April 8. In fact, the number more nearly resembles an 8 than a 5. Although construing the April 5 date as April 8 upsets the otherwise sequential entry of dates in the pharmacy record, we do not believe this destroys the officers' reasonable basis for believing probable cause existed. The record of sales maintained by Thielking is by no means an example of clarity.

McQuinley's mistake was unfortunate, but not unreasonable.[9] As such, it cannot be the basis for a § 1983 claim. *See Hunter*, 502 U.S. at 227, 112 S.Ct. at 536 (quoting *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039–40) ("[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity").

Eversole argues that McQuinley's mistake was not reasonable because a simple inquiry to the Thielking pharmacist would have confirmed the actual date of her cough medicine purchase. The fact that McQuinley might have discovered his mistake had he questioned the pharmacist about the dates recorded in the log is of no consequence. We

have consistently held that "'once police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence.'" *Garcia v. Chicago*, 24 F.3d 966, 970 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1313, 131 L.Ed.2d 194 (1995) (quoting *Schertz v. Waupaca County*, 875 F.2d 578, 583 (7th Cir. 1989)); *see also Hunter*, 502 U.S. at 228–29, 112 S.Ct. at 537 ("the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed ..."). If McQuinley had been in doubt about the dates recorded in the pharmacy logs, he certainly should have questioned store employees, but since there is no evidence in the record to lead us to believe or even conjecture that he was in doubt and believed the date on the pharmacy record to be anything other than April 8, 1988, there was no need for him to conduct any further investigation, *i.e.*, asking any more questions.

## III. CONCLUSION

The judgment of the district court is

AFFIRMED.

MORAN, District Judge, concurring in part and dissenting in part.

I join in the Court's opinion, with one exception: I do not believe that Detective McQuinley is entitled to qualified immunity. I would reverse the district court and deny his motion for summary judgment.

The concept of qualified immunity has largely eviscerated "false arrest" as a constitutional tort because it bars relief unless there was plain incompetence or knowing violations. That protects Detective Sherck; the record indicates that he relied upon the information provided by his brother officer, and he was entitled to do so.

Detective McQuinley is another matter. Plaintiff suggests that a jury could find that

---

9. Indeed, the plaintiff conceded at her deposition that "it was fair to say" that an individual reading Thielking's records might mistake the April 5, 1988 handwritten entry as April 8, 1988.

McQuinley deliberately misread the date because plaintiff's son had had numerous prior problems involving criminal conduct, of which McQuinley was well aware and which had required McQuinley to deal with plaintiff on various occasions in the past. That stretches permissible inferences too far. I agree with the majority that the record establishes at most that he misread the number and did not realize that the entry, if April 8, was out of sequence.

But that, I believe, is enough to defeat qualified immunity. The sole bases for the arrest on a felony charge were the two entries in the logs. Anything more than the most superficial attention would have alerted the officer to the fact that the number in one was ambiguous and that, if it were an 8, it was out of sequence. It was plain incompetence to base a serious criminal charge upon so casual an investigation.