TAAHIRA W., a minor, by her next
friend Cheryl McCORD–
SALLEY, Plaintiff,

v.

Felicia TRAVIS, Aline Knight, Gloria
Brown, and Beatrice Berry,
Defendants.

No. 94 C 7406.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 20, 1995.

Peter J. Schmiedel, Charles Perez Golbert, Cook County Public Guardian, Patrick Thomas Murphy, Office of the Cook County Public Guardian, Chicago, IL, Deborah J. Gubin, Chicago, IL, for plaintiff.

Beatrice Berry, Chicago, IL, pro se.

Jennifer Marie Link, Limo T. Cherian, Illinois Attorney General's Office, Chicago, IL, for defendants.

## OPINION AND ORDER

NORGLE, District Judge:

This case arises from the tragedy visited upon Plaintiff Taahira W. ("Taahira") while she was in the custody of a licensed foster parent. Before the court is the motion to dismiss of Defendants Felicia Travis, Aline Knight, and Gloria Brown (collectively "Defendants"). The suit was filed pursuant to 42 U.S.C. § 1983 on Taahira's behalf by her grandmother, Cheryl McCord–Salley ("Salley"). The moving Defendants, named in their individual capacities, are sued for committing constitutional violations through their incompetence and conscious disregard in dealing with a ward of the state while under the employ of the Illinois Department of Children and Family Services ("DCFS").

### I.

Taahira was born September 9, 1984, to neglectful parents. In February 1992, the DCFS took custody of Taahira. In July of that year, the DCFS assigned Taahira to Defendant Beatrice Berry. While in Berry's home at seven years of age, Taahira was beaten and raped three times by Larry M. ("Larry"), a foster child assigned to Berry.

This case, the amended complaint avers, does not involve random acts of violence. As alleged, Defendants were aware of Larry's criminal sexual history, yet forced Taahira to live under the same roof as a known delinquent ward, thereby breaching their affirmative duty to Taahira.

The DCFS took custody of Larry on June 23, 1973, and assigned him to Berry's foster home. The amended complaint alleges that on January 6, 1992, Larry sexually assaulted a six year old foster child, named Vernisha, while both were under Berry's care and in Berry's home. On March 3, 1992, Larry was released from the juvenile detention center and returned to Berry for a few days. The six-year-old victim, Vernisha, still resided there. On March 10, 1992, Larry was adjudicated a delinquent for sexually assaulting Vernisha. After Vernisha and her siblings were finally relocated, Larry was again assigned to Berry on March 20, 1992. On that date, Defendant Felicia Travis, Larry's case-

worker, noted on Larry's file that Berry was generally unable to supervise foster children.

Later that month, on March 31, 1992, the juvenile court sentenced Larry to thirty days in juvenile detention followed by two years probation for sexually assaulting Vernisha. In addition to the sentence, moreover, the court order directed the DCFS not to entrust any small girls to Berry. The court further specified that DCFS should "keep watch" to ensure that no girls under twelve years were placed in that house. Some of the individuals personally present at the hearing, thus, personally aware of the court's order, included Defendants Travis and Berry, and DCFS court liaison John Horvath.

On June 5, 1992, Adrienne Giorgolo, an assistant public guardian assigned to Larry's case, contacted Defendant Gloria Brown, the DCFS licensing representative for Berry. Giorgolo asked Brown about the status of Berry's license given Larry's sexual assault of Vernisha. Brown agreed to reevaluate Berry's license and to investigate whether any foster children were under Berry's care. On the same day, Defendant Aline Knight communicated to Giorgolo that Larry had again been assigned to Berry's custody. Knight assured the assistant public guardian that no girls would be placed in the foster home with Larry. Knight's guarantee proved hollow.

The juvenile court appointed the DCFS legal guardian of Taahira on February 5, 1992. From February to July 1992, Taahira stayed with her grandmother, Salley. In early July, Salley returned Taahira and her siblings to the DCFS. Despite Knight's pledge and the court's explicit declaration, DCFS team supervisor Michael Barry approved the placement of Taahira and her brother Charles in the Berry foster home.

On July 22, 1992, Salley informed Kenneth Walsh, the Uhlich Children's Home caseworker (DCFS had contracted with Uhlich to provide placement and other services for Taahira and Charles), that the children had not been with her, but rather had stayed at another foster home for the preceding two weeks. The next day, Salley explained to Walsh that she needed two more weeks before she again could tend to the children.

After Walsh obtained Berry's consent to keep the children and DCFS supervisor Michael Barry approved the extension, Taahira and Charles remained in Berry's house for two additional weeks.

Two years later, when she was nine, Taahira revealed to Salley that Larry had sexually assaulted her three times while she had been under Berry's care as a foster parent. Taahira recounted that, on the first occasion, Larry entered her bedroom and put his penis into her vagina. On the second occasion, Larry beat her and then raped her in a closet. On the third, Larry raped her on a couch in Berry's living room—indeed, while others were present in the foster home. Taahira was seven years of age when she was raped by Larry.

Salley took Taahira to a hospital a week after learning about the attacks. On January 25, 1994, the staff at Columbus Hospital performed a genital examination of Taahira. They made findings consistent with sexual abuse. On August 30, 1994, Larry pleaded guilty to the aggravated sexual assault of Taahira. The court this time sentenced Larry to six years imprisonment in the Illinois Department of Corrections.

Travis and Knight filed the instant motion to dismiss, in which Brown joined. Berry, who is not represented by counsel, is not a party to this motion. Defendants raise three arguments. First, Defendants contend that the amended complaint does not allege a constitutional violation; rather it claims a broad right which the law does not recognize. Second, that even if the court recognizes a potential violation of a constitutional right, then the court should dismiss the amended complaint for failing to plead that Defendants violated the standard of deliberate indifference. Third, Defendants submit that the doctrine of qualified immunity operates to shield them from liability.

## II.

On a motion to dismiss, the court accepts all well-pleaded factual allegations as true, as well as all reasonable inferences drawn from those allegations. *Stephenson v. Stone*, 21 F.3d 159, 161 (7th Cir.1994). Because federal courts simply require "notice pleading," this court must construe pleadings liberally. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166–67, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993). A complaint's mere vagueness or lack of detail is not sufficient to justify a dismissal. *Strauss v. City of Chicago*, 760 F.2d 765, 767 (7th Cir.1985). A complaint need not specify the correct legal theory or point to the right statute to survive a motion to dismiss. *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134–35 (7th Cir.1992).

In *Early v. Bankers Life & Casualty Co.*, 959 F.2d 75, 79 (7th Cir.1992), the Seventh Circuit Court of Appeals explained how courts must liberally assess the merits of a complaint for purposes of a motion to dismiss. When responding to a motion to dismiss, a plaintiff may "allege without evidentiary support any facts he pleases that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle him to judgment." *Id.* The court will interpret ambiguities in a complaint in plaintiff's favor, not defendant's. *Canedy v. Boardman*, 16 F.3d 183, 188 (7th Cir.1994). In fact, federal standards for notice pleading are so lenient that, on appeal, the Seventh Circuit will allow an appellant to present facts which were not in the district court record—an "unsubstantiated version of the events"—to demonstrate that the district court should not have dismissed the complaint. *Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir.1992).

## III.

Plaintiff's one-count amended complaint seeks relief for violations of her substantive due process rights pursuant to 42 U.S.C. § 1983. To state a viable claim under § 1983, a plaintiff must allege deprivation of "an interest secured by the Constitution or laws of the United States, and the deprivation was visited upon [her] by a person or persons acting under color of state law." *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1249 (7th Cir.1994) (citing *Gomez v. Toledo*, 446 U.S. 635, 638–42, 100 S.Ct. 1920, 1923–24, 64 L.Ed.2d 572 (1980)); *Vasquez v.*

*Hernandez,* 60 F.3d 325, 328 (7th Cir.1995). There is no question that the movants were acting under color of state law. The particular inquiry is whether their actions and omissions rose to the level of a constitutional violation.

■ The first step in analyzing a § 1983 claim is to define the particular constitutional injury involved. *Id.* Given the amended complaint's allegations, the issue may be narrowed as follows: Whether, as the result of state action, a child who is removed from her parents and placed in state-licensed foster care has a cognizable constitutional right to be free from placement with a known abusive or neglectful foster parent or foster care residential environment. The right in question, if one exists, must fall under the substantive Due Process component of the Fourteenth Amendment. *See generally Camp v. Gregory,* 67 F.3d 1286 (7th Cir.1995). Substantive due process derives from "the many constitutional rules that protect personal liberty from unjustified intrusions." *National Paint & Coatings v. City of Chicago,* 45 F.3d 1124, 1129 (7th Cir.1995). Substantive due process rights are those rights which the state is powerless to take away, *Gosnell v. City of Troy,* 59 F.3d 654, 657 (7th Cir.1995), and include those articulated in the Bill of Rights and those considered so fundamental in our society that a state may not unjustly take them away. *See generally Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Taylor by and Through Walker v. Ledbetter,* 818 F.2d 791, 794 (11th Cir.1987). The *Taylor* court explained that some of the essential due process rights not listed in the Bill of Rights include rights to abortion, privacy, marriage, safety and physical movement. *Id.* (citing the Supreme Court cases validating those rights).[1]

The right alleged in the instant case concerns freedom from physical abuse, a right protected by the Due Process Clause. At first blush, as Plaintiff argues, the existence of such a right appears obvious. Defendants, though, disagree. They begin with the axiom that there is no constitutional duty to protect against private violence, *Bank of Ill. v. Over,* 65 F.3d 76, 77 (7th Cir.1995), and the maxim that foster children do not have a constitutional right to a stable foster home. *K.H. Through Murphy v. Morgan,* 914 F.2d 846, 853 (7th Cir.1990). Thus, they conclude, social service officials generally cannot be liable for failing to prevent the placement of a child into an unsafe environment; they believe that no such affirmative duty exists. Defendants do recognize, as they must, a child's right not to be handed over by the state to a foster parent whom the state knows or suspects to abuse children. *See K.H.,* 914 F.2d at 852–53. Yet that right, they argue, is not so broad as to impose an affirmative duty on all state officials to prevent harm from befalling all DCFS wards.[2]

Again, the Seventh Circuit recognizes the right of a foster child not to be placed in an environment that the state knows or suspects is under the command of a neglectful or abusive foster parent. *Camp,* 67 F.3d 1286; *K.H.,* 914 F.2d 846. The right itself is not novel. The Second Circuit Court of Appeals was among the first to recognize a foster child's cause of action against a state agency in 1981. In *Doe v. New York City Dept. of Social Serv.,* 649 F.2d 134 (2nd Cir.1981), the court held that a foster child could maintain a § 1983 cause of action against a state agency for violating her Fourteenth Amendment rights where foster parents physically abused the child. Over the years, other circuits have issued similar rulings. *Taylor by and Through Walker v. Ledbetter,* 818 F.2d 791, 794 (11th Cir.1987) (holding that the state deprived the ward of a safe foster care environment where the foster mother beat the child so violently that the child lapsed into a coma); *Meador v. Cabinet for Human Resources,* 902 F.2d 474, 476 (6th Cir.1990)

---

1. In contrast, when analyzing procedural due process, the court examines whether a state created a liberty interest such that a constitutional violation would result if a person were deprived the interest without notice and an opportunity to be heard. *Kraushaar v. Flanigan,* 45 F.3d 1040, 1048 (7th Cir.1995).

2. For a discussion of the statutes governing relationships of foster children and foster parents, see generally *Procopio v. Johnson,* 785 F.Supp. 1317 (N.D.Ill.1992), *aff'd,* 994 F.2d 325 (7th Cir. 1993).

(holding that substantive due process "extends the right to be free from the infliction of unnecessary harm to children in state-regulated foster homes"); *Yvonne L. v. New Mexico Dep't of Human Serv.*, 959 F.2d 883, 893 (10th Cir.1992) (it was clearly established in the 10th Circuit as of 1985 that, "if the persons responsible place children in a foster home or institution that they know or suspect to be dangerous to the children[, then] they incur liability if the harm occurs"); *Norfleet v. Arkansas Dep't of Human Serv.*, 989 F.2d 289, 293 (8th Cir.1993) (reasoning that, because children in foster care have already demonstrated an inability to care for themselves, and because of existing law on the point, a clearly established duty existed in 1991 to provide adequate protection for and supervision of foster children).

The Seventh Circuit first examined the right in *Doe v. Bobbitt*, 881 F.2d 510 (7th Cir.1989), which involved a suit against DCFS employees for placing a child in the custody of her aunt despite warnings from the child's mother that members of the aunt's household used drugs and had sexually abused the child in the past. In analyzing the qualified immunity doctrine, the Seventh Circuit questioned whether foster children possessed a clearly established constitutional right in 1984 not to be placed in an unsafe environment where the official had information that the environment might pose a threat to the child's safety. The court held that any such right was not clearly established in 1984, thus, the official was immune from liability. *Id.* at 512. The *Bobbitt* court did not, however, outright recognize that the right existed as of the date that decision was issued.

The United States Supreme Court first addressed the question of imposing liability on state officials for placing a child in a dangerous environment in *DeShaney v. Winnebago County Dep't Social Serv.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), an appeal from the Seventh Circuit. In that case, state officials had become aware that a father physically abused his son on a number of occasions. After one particular incident, a team of professionals investigated and concluded that there was not enough evidence of abuse to take the boy into court custody. Over the next year a caseworker visited the boy's home numerous times, noting that the boy would often have injuries consistent with abuse, and recorded the boy's visits to the emergency room. The boy was never taken from his father. Eventually, the boy's father beat him so severely that the boy suffered brain damage and was expected to spend the rest of his life confined to an institution for the profoundly retarded. Affirming the Seventh Circuit, the Supreme Court held that the state was not liable under the Due Process Clause of the Fourteenth Amendment for not protecting the boy from violence at the hand of his father. *Id.* at 1007, 109 S.Ct. at 202–04.

However, the *DeShaney* Court suggested a hypothetical situation, very similar to the facts here, which might rise to the level of a constitutional violation. *Id.* at 201 n. 9, 109 S.Ct. at 1006 n. 9. The Court wrote: "Had the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." *Id.* See also *Jeanine B. by Blondis v. Thompson*, 877 F.Supp. 1268, 1277 (E.D.Wis.1995) ("[A]lthough the Constitution does not generally require governments to act affirmatively to provide services and care, certain affirmative duties arise from the Constitution when a 'special relationship' exists between the plaintiff and the government. That special relationship is when the plaintiff is in the government custody."); cf. *Bailor v. Salvation Army*, 51 F.3d 678 (7th Cir.1995) (analyzing special relationship in the context of Indiana tort law, and finding that the Salvation Army did not owe plaintiff, an administrative assistant, a duty to protect her from a Salvation Army resident).

Subsequent to *DeShaney*, and consonant with the Supreme Court's dicta there, the Seventh Circuit issued its opinion in *K.H. Through Murphy v. Morgan*, 914 F.2d 846 (7th Cir.1990). In *K.H.*, the plaintiff had been placed by the state in nine different foster homes by the time she was six years old and was abused in some fashion in most

of those homes. The consequent lawsuit, a 42 U.S.C. § 1983 action, was based on the Due Process Clause of the Fourteenth Amendment. *Id.* at 849. The court decided that the state had assumed some level of responsibility once it removed the child from the parents' custody. *Id.* Referring to *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), a case involving the involuntary commitment of a retarded adult, the court wrote: "It should have been obvious from the day *Youngberg* was decided that a state could not avoid the responsibilities which that decision had placed on it merely by delegating custodial responsibility to irresponsible private persons. . . ." *Id.* at 851. Therefore, the *K.H.* court held that in the Seventh Circuit, "[t]here is, made explicit by this opinion . . . , a prima facie right not to be placed with a foster parent who the state's caseworkers and supervisor know or suspect is likely to abuse or neglect the foster child." *Id.* at 853. Although *Doe v. Bobbitt* wavered on whether the right existed in 1984, in *K.H.*, the Seventh Circuit explicitly decreed that, as of the date of that opinion, foster children possess a substantive Due Process right not to be relegated to a neglectful or abusive foster parent.

■ The Seventh Circuit recently reiterated its position in *Camp v. Gregory*, 67 F.3d 1286 (7th Cir.1995). As definitively articulated in that case, the law affords foster children a substantive Fourteenth Amendment Due Process right to be free from placement in a foster care environment which the state knows or suspects is abusive, or is unable to exercise the necessary degree of supervision over the child. *Id.* at 1293–94. In *Camp*, the DCFS became the guardian of a ward, Anthony, after his aunt requested she be relieved of appointment due to her own health. Anthony was determined to need a highly structured environment, something his aunt was unable to offer. Although not mentioned in the amended complaint, both the district and appellate courts recognized the need for structure stemmed from Anthony's involvement in gangs. Despite knowing that the aunt's home was located in an environment dangerous to Anthony and that his aunt could not control him sufficiently, the DCFS caseworker assigned Anthony to live with his aunt. The caseworker also failed to arrange for guidance or educational programs, and failed to check on Anthony's progress. Yet, when testifying before a state court, the caseworker falsely stated that Anthony was attending school and was progressing well. Following the court hearing, the aunt communicated to Anthony's caseworker that she could not ensure her nephew's safety, that he was not attending school, and that he was putting himself in dangerous situations. Two months later, the ward was shot and killed near his home at the hands of someone other than a family member (presumably a gang related incident).

Citing *DeShaney* and *Youngberg,* the *Camp* court explained that a state takes on affirmative duties of care and protection for certain individuals. *Id.* at 1291–92; *see also DeShaney,* 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9. Once the state court appointed the DCFS guardian, the DCFS became constitutionally liable, to some degree, for the ward's well-being. *Id.* 1292, 1294; *see also K.H.,* 914 F.2d at 849 (analogizing this constitutional affirmative duty to the affirmative duty of a rescuer in tort law, and reasoning that "[t]he state, having saved a man from a lynch mob, cannot then lynch him, on the ground that he would be no worse off than if he had not been saved"). Furthermore, the court cited the DCFS regulation requiring its staff to assure supervision at all times, including when the caretaker is preoccupied outside the household. *Id.* (citing Ill.Admin.Code tit. 89, § 335.202(c)(7) (1995)).

The *Camp* court went further than is required for this case. *Camp* also stands for the proposition that, in certain situations, an official can be liable for injuries that befall a foster child while outside the home. *Id.* at 1296–97. "Commensurate with the parental obligation to supervise a child's activities outside the home is a duty on the part of the state not to place one of its charges with an adult that it knows will not or cannot exercise that responsibility." *Id.*

Nevertheless, in Taahira's case the harm occurred in the foster home, and the law is abundantly clear that Taahira possessed a right to be free from knowing placement in

an unsupervised and abusive foster care environment. Larry was the key component to the dangerousness of the environment, and he was a danger well-known to Berry, Travis, Knight, and Brown. The state, via the DCFS, owed Taahira the complementary affirmative duty not to place her in such an environment.

## IV.

The next issue may be divided in two. First, whether the DCFS generally breached its duty. Second, whether Defendants are individually responsible for the breach.

■ Not every injury suffered by a foster child can be attributed to neglect or abuse. Similarly, not every decision to place a child in a foster home that turns out to be abusive can expose an official to liability. To assess whether the decision of DCFS to place Taahira with Berry breached its duty, the decision must be measured against the appropriate standard. The Seventh Circuit evaluates decisions in this area differently than it evaluates official decisions in other contexts. In other civil rights cases—for instance, cases involving prisoner's rights—an official's decisions and actions are judged by the deliberate indifference standard. *E.g., Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (explaining the standard by which a prisoner's claim of medical mistreatment is judged). When dealing with a placement decision, the Seventh Circuit asks whether the DCFS worker failed to exercise professional judgment. *Camp,* 67 F.3d at 1297. The *K.H.* decision is instructive:

> [C]hild welfare workers and their supervisors have a secure haven from liability when they exercise a bona fide professional judgment as to where to place children in their custody. Only if without justification based either on financial constraints or on considerations of professional judgment they place the child in hands they know to be dangerous or otherwise unfit do they expose themselves to liability in damages.

914 F.2d at 854. *See also Wendy H. By and Through Smith v. City of Philadelphia,* 849 F.Supp. 367, 372 (E.D.Pa.1994) (interpreting the Seventh and Tenth Circuits as applying the professional judgment standard, and the Eleventh and Second Circuits as following the deliberate indifference standard). In an effort to confine the boundaries of personal liability, the *Camp* court suggested three parameters in addition to the requirement of professional judgment: (1) the worker must have failed to exercise bona fide professional judgment; (2) the caretaker's actions or omissions must have fallen short of a reasonable degree of supervision; (3) the injury suffered must have been reasonably foreseeable; and (4) there must have been a sufficient causal link between the injury and the failure to provide supervision. *Camp,* at 1297.

■ The amended complaint illustrates that Taahira's constitutional right was violated when she was assigned to Berry's house because it contained the known, foreseeable danger to Taahira embodied in Larry and the known inability of Berry to supervise and control. The pleading also illustrates, for purposes of the motion to dismiss, that *Camp's* four recommended elements were present. The first element is satisfied because the circumstances surrounding Taahira's placement is facially inconsistent with an exercise of professional judgment. With respect to the second factor, the amended complaint avers a lack of professional judgment and the caretaker's lack of supervision in two respects. First, the DCFS was aware that Berry was unable to supervise after Larry's sexual attack of Vernisha came to light. Second, even if it could be argued that Berry was not unfit after Vernisha's attack, that Taahira was raped on three separate instances all under one roof manifests Berry's lack of control over the household, her failure to provide a safe environment, and her inability to perceive or prevent the presumably visible signs of physical abuse. Larry's attacks were not single or random events. They followed a pattern that began with his assault on Vernisha.

Regarding the third factor, Taahira's injury was foreseeable because Taahira suffered the exact same injury as Vernisha sustained five months prior, was under the care of the same foster parent in the same residential environment, and, most importantly, attacked

by the same ward. The state judge who found Larry a delinquent foresaw future injury (and put others on notice to this effect) when he ordered the DCFS to separate Larry from other little girls after he had attacked Vernisha. Lastly, the causal link between the lack of supervision and the injury is alleged in that the rape of Vernisha and all three rapes of Taahira occurred in Berry's home. Accordingly, liability will attach to those defendants who are responsible for making the decisions, or failing to act, which resulted in Taahira's injurious placement in Berry's house.

## V.

The second aspect of the breach issue is whether Defendants, individually, (1) personally owed Taahira a duty as a result of their responsibilities at DCFS, and (2) breached that duty through actions or decisions that did not involve the requisite professional judgment. Given the very liberal standard afforded complaints when considering motions to dismiss, the court finds that the amended complaint adequately pleads that each defendant had affirmative duties as a professional to protect Taahira from suspected neglect and abuse.

The amended complaint alleges that Brown was the DCFS licensing representative for Berry. As a licensing representative, Brown had the duty to monitor foster homes and to measure compliance with the law and DCFS standards. *See, e.g.,* Ill.Admin.Code tit. 89, § 335.202(e)(7) (1995) (providing that DCFS staff must ensure that supervision is furnished at all times). Brown was made aware that Berry might be unfit as a foster parent on June 5, 1992, by Assistant Public Guardian Giorgolo. Because of Larry's sexual assault of Vernisha, Giorgolo inquired of Brown about the licensing status of Berry. Brown responded that she would determine whether other foster children were in Berry's house.

Defendant Knight was a team supervisor of caseworkers. Her duty was to make certain that the children were in safe foster homes, free from neglect and abuse. Knight indicated that she was aware that Berry was not an adequate foster parent on June 5,

1992. That day, Knight called Giorgolo to relay that Larry was staying at Berry's home. Knight guaranteed the assistant public guardian that no girls were there.

Defendant Travis was Larry's caseworker. As part of her duty, she accompanied Larry to court for his sexually assault of Vernisha. She was present when the court ordered the DCFS not to place small girls in Berry's home and heard the court's instruction to "keep watch" that no girls under twelve would be placed with Berry. In addition, prior to the court date, Travis made a notation in Larry's file that Berry was unfit to supervise children.

 The amended complaint demonstrates "such a substantial departure from accepted professional judgment, practice, or standard as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462. Not only did each Defendant have a good reason to suspect Berry's ability to care for small girls, a state judge even ordered the DCFS to keep small girls out of Berry's house. Brown knew that Berry was unfit once the assistant public guardian notified her. The amended complaint states that Brown was responsible to monitor foster homes, and yet she did not alter Berry's license to reflect the court's order prohibiting boarding no small girls with Berry (let alone revoke the license altogether). Knight, too, was suspicious of Berry's competence as a foster parent. Knight failed in her responsibility to oversee Taahira's caseworker and failed in her responsibility to care for Taahira generally. Furthermore, Knight went so far as to guarantee personally that no young girls would be assigned to Berry, thereby encouraging Giorgolo not to act. Travis had first hand knowledge of the court order that mandated that no young girls be placed with Berry. Travis also made a notation on Larry's file that Berry could not supervise children, yet allowed Larry to return to Berry's home.

"Just as the Roman state was a doer of harm when it threw Christians to lions," *K.H.,* 914 F.2d at 849, so too were these Defendants when they consigned Taahira to

a foster home with a ward known to rape little girls. As alleged, none of the Defendants took appropriate steps to revoke Berry's license, to make a notation in Berry's file of the court order designed to protect small girls, or simply to read Berry's file before placing Taahira there. Furthermore, Taahira was raped on three separate occasions over a period of a month. This leads to the inference that Defendants sufficiently failed to check on Taahira's well-being, even though, as alleged in the amended complaint, their job responsibilities required them to do so. Certainly, the court recognizes that others (who could be brought into the suit) may be more culpable. Yet that fact does not relieve Defendants of potential liability at this stage of the proceedings. Accordingly, the amended complaint sufficiently avers that Defendants failed to act with the appropriate professional judgment, thereby breaching their duty not to place Taahira in a neglectful, unsupervised foster care environment.

## VI.

The last issue is whether the doctrine of qualified immunity operates to protect Defendants. The *K.H.* decision was an appeal from the district court's rejection of the immunity defense; and here, as there, the only facts before the court are those alleged in the complaint, which must be taken as true. *K.H.,* 914 F.2d at 847.

 The doctrine itself is a judicial addition to the civil rights statutes and, therefore, is viable only if the defense serves a social purpose. *K.H.,* 914 F.2d at 850. Qualified immunity was designed to prevent the "distraction of officials from their governmental duties." *Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982). "The purpose of qualified immunity is 'to safeguard government, and thereby to protect the public at large, not to benefit its agents.'" *Rambo v. Daley,* 68 F.3d 203, 205–06 (7th Cir.1995) (quoting *Wyatt v. Cole,* 504 U.S. 158, 167–68, 112 S.Ct. 1827, 1833, 118 L.Ed.2d 504 (1992)).

 "The doctrine of qualified immunity shields public officials ... from damages unless their conduct was unreasonable in light of clearly established law." *Elder v. Holloway,* —— U.S. ——, ——, 114 S.Ct. 1019, 1021, 127 L.Ed.2d 344 (1994). It shields government officials from civil liability when officials perform discretionary functions and "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gavin v. McGinnis,* 866 F.Supp. 1107, 1112 (N.D.Ill.1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 817–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). The immunity will operate where the constitutional right alleged was not clearly established at the time in question. *Eversole v. Steele,* 59 F.3d 710, 717 (7th Cir.1995); *Zorzi v. County of Putnam,* 30 F.3d 885, 892 (7th Cir.1994). Whether a right is clearly established is a question of law, and the plaintiff shoulders the burden of demonstrating the right's existence. *McGrath v. Gillis,* 44 F.3d 567, 570 (7th Cir.1995). A violation of a clearly established right occurs when "a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)).

 The Seventh Circuit has articulated a two step analysis for assessing the doctrine of qualified immunity: " '(1) does the alleged conduct set out a constitutional violation? and (2) were the constitutional standards clearly established at the time in question?'" *Zorzi,* 30 F.3d at 892 (quoting *Rakovich v. Wade,* 850 F.2d 1180, 1210 (7th Cir.1988)). In the instant case, as marked in *K.H.,* the right at issue was clearly established as of 1990—two years before the wrongful conduct alleged here occurred. Also, as noted above, the facts alleged set out a violation of that clearly established constitutional right.

On the issue of qualified immunity, the *Camp* case is distinguishable. In *Camp,* the court held that the qualified immunity doctrine protected the defendant from liability. The focus of that analysis, however, was on the child's activities outside the home, which is radically different from this case. The *Camp* court examined whether the defendant should have known in 1991 that the law would hold an official liable for the knowing placement of a ward with a caretaker who

could not provide a reasonable degree of intervention and supervision in the child's activities outside the home. *Camp,* 67 F.3d at 1297–98. The focus in this case is not on a child's activities outside the home. The focus in this case is on the supervision of the members of the household (*viz.,* Larry, who was not a blood relative of Taahira) within the home itself, and about the actions and omissions that resulted in Taahira's placement in a neglectful, abusive, and unsupervised residential foster environment. This court views the nucleus of *Camp* as the jungle outside, while here the emphasis is on the residential cage where Larry is known to reign. Accordingly, under the facts as alleged in the complaint, again mindful of the liberal standard pertaining to motions to dismiss, the immunity defense does not shield Defendants from liability at this stage of the litigation.

## VII.

For the reasons stated above, the court holds that a plaintiff may survive a motion to dismiss where she sufficiently pleads that a state official, charged with an affirmative duty to provide for the care of a foster child, is personally liable for abusing professional judgment when placing a ward into a known or suspected abusive foster environment. The court is not proposing that the DCFS and its employees can be held liable for every action of a delinquent ward. Nor does the court suggest that a caseworker's mere negligence will give rise to liability. Yet, where the injury was as foreseeable as this one (an injury carried out by a delinquent who, months before, committed the same type of violence, in the same foster home, against the same type of helpless victim, and an injury which the state court wanted to protect against and ordered the DCFS to prevent), liability may attach. For the reasons stated above, the court denies Defendants' motion to dismiss.

**IT IS SO ORDERED.**