Robert Anthony JOHNSON by and on behalf of himself and Robert Jamal Johnson, a minor, and Jamir Malik Johnson, a minor, Plaintiffs,

v.

Charlene COLLINS, Pamela Mannie, and Unknown Wisconsin Investigators, Defendants.

No. 98 C 3516.

United States District Court,
N.D. Illinois,
Eastern Division.

July 22, 1999.

Robert A. Johnson, Kenosha, WI, for plaintiffs.

Charles A. Rego, Assistant Attorney General, General Law Bureau, Chicago, IL, for defendants.

### MEMORANDUM OPINION AND ORDER

DENLOW, United States Magistrate Judge.

## I. INTRODUCTION

 Robert Johnson ("Plaintiff Johnson") filed a *pro se* second amended complaint on behalf of himself and his two sons, Jamal and Jamir Johnson ("minors"), 6 and 5 years of age respectively (collectively "Plaintiffs"). Plaintiffs allege various constitutional violations under 42 U.S.C. § 1983 against two employees of the Illinois Department of Children and Family Services ("DCFS") in their individual capacity: Charlene Collins, a DCFS caseworker; and Pamela Mannie, a DCFS caseworker supervisor; and unknown Wis-

consin investigators[1] (collectively "Defendants"). Plaintiffs' complaint alleges claims for denial of the minors' substantive due process right[2] to suitable foster care placement, denial of the minors' substantive due process right to basic medical care, and retaliation against Plaintiff Johnson. This matter is now before the Court on Defendants' motion to dismiss. The motion to dismiss raises three issues: 1) whether federal jurisdiction is barred by the *Rooker–Feldman* doctrine, 2) whether the second amended complaint states a claim upon which relief can be granted, and 3) whether the Defendants enjoy qualified immunity from suit.[3] For the reasons stated below, the motion to dismiss is granted because the Court does not have subject matter jurisdiction under the *Rooker–Feldman* doctrine. Nevertheless, the Court will also address the Defendants' qualified immunity defense for purposes of judicial economy.[4]

## II. STANDARD OF REVIEW

The court must accept as true the well-pleaded factual allegations in a complaint and draw all rational inferences in favor of the plaintiff in assessing a motion to dismiss for failure to state a claim. *Hishon v. King & Spalding*, 467 U.S. 69, 72, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir.1996). Only when the plaintiff is unable to prove any set of facts in support of his claim that would entitle him to relief may the court dismiss a complaint for failure to state a claim under Fed.R.Civ.P.

---

1. The unknown Wisconsin investigators have never been identified or served and are not parties.

2. Substantive due process rights are those articulated in the Bill of Rights and those considered so fundamental in our society that a state may not unjustly take them away. *See Taahira W. ex rel. McCord–Salley v. Travis*, 908 F.Supp. 533, 536 (N.D.Ill.1995); *see generally Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Procedural due process analysis, by contrast, concerns whether a state created a liberty interest such that a constitutional violation

would result if a person were deprived the interest without notice and an opportunity to be heard. *Taahira W.*, 908 F.Supp. at 536 n. 1.

3. While the Court will not address the issue of stating a claim upon which relief may be granted separately, the Court will address this issue in the context of its discussion of qualified immunity.

4. In the event of a possible appeal, this Court believes that it is preferable to decide all issues for review at one time.

12(b)(6). *Porter*, 93 F.3d at 305. The standard for pleading requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

▆ In addition, the Supreme Court has articulated a different, more lenient standard by which courts should assess pleadings prepared by *pro se* plaintiffs. "We cannot say with assurance that under the allegations of the *pro se* complaint, which we hold to less stringent standards than formal pleadings drafted by lawyers, it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). Consequently, *pro se* complaints must be liberally construed. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Courts must ensure that the claims of *pro se* plaintiffs are given "fair and meaningful consideration." *Matzker v. Herr*, 748 F.2d 1142, 1146 (7th Cir.1984). Furthermore, courts should not require the complaint to identify the correct legal theory to survive a motion to dismiss. *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir.1992).

▆ When reviewing a motion to dismiss for lack of subject matter jurisdiction, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir.1979), *quoted in Long v. Shorebank*, 182 F.3d 548, 554 (7th Cir.1999).

## III. BACKGROUND FACTS

Plaintiff Johnson and the biological mother, Carla Eason, first began litigation when Johnson sought to establish paternity of his children. On May 19, 1995, the Circuit Court of Cook County set a visitation schedule and medical examinations of the children at Evanston Hospital. (Defs.' Mot. to Dismiss, Ex. A.) In June of 1995, Plaintiff Johnson noticed bruises on minor Jamir and took him to the hospital at which point DCFS began their initial involvement. On June 23, 1995 the minors were taken into protective custody. (Defs.' Mot. to Dismiss, Ex. B.) Four days later they had their first custody hearing in juvenile court. Both Johnson and the mother were present in court and Johnson was represented by counsel. The Judge found probable cause that the minors were abused or neglected based on "unexplained bruising to minors' temples and on cheek not adequately explained by caretaker (mother)." (Defs.' Mot. to Dismiss, Ex. C.) Temporary custody was given to DCFS and a Cook County Public Guardian was appointed as guardian ad litem. (Defs.' Mot. to Dismiss, Ex. D.)

The Defendants were fully aware of the minors' condition of medical neglect at the time the state assumed custody of them on June 23, 1995. (Pls.' Compl. ¶ 21.) According to Plaintiffs, doctors reported that the minors had been medically neglected while wards of and under the protection of the State between June of 1995 and June of 1996. (Pls.'s Compl. ¶ 15.) Moreover, an Evanston Hospital doctor reported to Plaintiff Robert Johnson that he could not understand how the injuries to the minors could have gone unnoticed by the DCFS caseworkers. (Pls.'s Compl. ¶ 39.)

In June of 1995, after DCFS was given custody, the minors were initially placed with their maternal grandmother ("Foster Parent"). While Foster Parent had custody of the minors, she suffered an emotional breakdown and was consequently admitted to a psychiatric ward. Soon after, Foster Parent contacted Defendant Mannie, a DCFS caseworker, and requested that Mannie relocate the minors. Foster Parent stated that due to her lack of ability to take care of the minors she was going to release them back to the mother, which would be in contravention to the juvenile court's order. (Pls.' Compl. ¶ 32.) Defen-

dant Mannie encouraged Foster Parent "to deal with the situation" as best she could and informed her that "if the courts were made aware of these concerns, the minors would be placed in a traditional foster home away from both the families." (Pls.'s Compl. ¶ 33.) When Plaintiff Johnson inquired about Foster Parent, Defendant Mannie told Plaintiff Johnson that DCFS was aware of Foster Parent's "illness" but had received prior approval from a medical doctor stating that she was capable of caring for the minors. (Pls.' Compl. ¶ 36.) The Defendants continued placement with Foster Parent despite opposition from Foster Parent's psychiatrist and one of the minors' doctors. (Pls.'s Compl. ¶ 32.)

In November, 1995, Foster Parent released the minors back to the mother. On November 17, 1995, there was another hearing in juvenile court in which the court entered both a disposition order and an order of protection directed at the mother. (Defs.' Mot. to Dismiss, Ex. G.) The juvenile court terminated temporary custody and placed the minors back in their mother's legal custody. At this time, the juvenile court imposed several conditions on the mother relating to the minors' care which included requiring that the minors attend regular appointments with a pediatrician, that the mother's live-in boyfriend, Terrence Miller, have no contact with the minors, and that the minors be made available to their father for visitation. (Defs.' Mot. to Dismiss, Ex. H.) It is also alleged that, at this time, Defendant Collins knew but disregarded the fact that Miller resided four blocks away from the mother's residence. (Pls.' Compl. ¶ 43.) At the same hearing, Plaintiff Johnson received a protective order from the juvenile court imposing several conditions, including the

condition that Plaintiff Johnson provide medical care for the minors and participate in unsupervised visitation at the discretion of DCFS. (Defs.' Mot. to Dismiss, Ex. I.)

From November 17, 1995 through January 31, 1996 the mother violated the court order by residing with Miller who abused the children. (Pls.' Compl. ¶ 41.) Although the minors were not monitored by DCFS, Defendant Mannie was aware that the mother was living with Miller and disregarded concerns that the minors were being abused. (Pls.' Compl. ¶ 79.) The Evanston Hospital reported injuries such as a broken arm, burns, and bruises and indicated that it was beyond comprehension that these injuries went unnoticed by DCFS. (Pls.' Compl. ¶¶ 38, 39.)

Approximately one month later, on December 22, 1995, Plaintiff Johnson filed a rule to show cause with the juvenile court claiming that he was not receiving visitation rights. The juvenile court subsequently entered an order directing DCFS to investigate the mother's compliance with the order of protection and other matters.[5] On January 17, 1996, the juvenile court ordered DCFS to provide visitation rights to Plaintiff Johnson once per week and reiterated the importance of the mother's compliance with the November 17, 1995 order of protection. (Defs.' Mot. to Dismiss, Ex. L.)

Almost six months later, in mid-June after the discovery of minor Jamir's two fractured arms, the court held a second custody hearing concerning the minors' welfare, (Defs.' Mot. to Dismiss, Ex. N.), and ordered DCFS to remove the minors from the mother's home and place them with the paternal grandmother in Kenosha, Wisconsin until Plaintiff Johnson's home could be adequately evaluated.

---

**5.** Conditions set forth in the December 22, 1995 court order included the following provisions: 1) DCFS shall complete the interstate compact evaluating the paternal grandmother's home in Wisconsin; 2) DCFS shall submit a report from all counselors involved with mother and father; 3) minors should be seen by the Evanston Child and Adolescent Clinic

(Father will pay for the medical checkup within five days of this order); 4) DCFS shall report on mother's living arrangements and the conditions of the living environment; and 5) DCFS shall report to the court on mother's compliance with the order of protection. (Defs.' Mot. to Dismiss, Ex. K.)

(Defs.' Mot. to Dismiss, Ex. O.) After the court order on June 13, 1996 the paternal grandmother had custody of the children until January 8, 1997, when the juvenile court awarded legal custody to Plaintiff Johnson and closed the case. (Defs.' Mot. to Dismiss, Ex. P.)

During this time Plaintiff Johnson wrote a letter to Senator Carol Moseley–Braun complaining about the actions of DCFS. According to the Plaintiffs, this letter to the Senator caused the Defendants to "retaliate" against Plaintiff Johnson. (Pls.' Compl. ¶ 90.) For example, DCFS Defendants informed Plaintiff Johnson that they "can play hard ball too" and they made four separate visits to Plaintiff Johnson's residence even though the Wisconsin Social Services had previously determined that there were no concerns regarding Plaintiff Johnson's home. (Pls.' Compl. ¶ 60.) Plaintiff Johnson alleges that DCFS employees conducted inspections of his home at inconvenient times, such as at 2:00 a.m. and 6:00 a.m. (Pls.' Compl. ¶ 60.) Moreover, he claims that the Defendants attempted to make him complete counseling services he had already completed. (Pls.' Compl. ¶ 60.) At some point, Plaintiff Johnson became concerned about the conflicting stories told by DCFS and had the DCFS Inspector General's office investigate the caseworkers to determine "if any caseworker's conduct rose to the level of a constitutional violation." (Pls.' Compl. ¶ 16.) On February 28, 1997 the DCFS Inspector's Generals office dismissed the investigation. (Pls.' Compl. ¶ 17.) Consequently, the Director of DCFS wrote Plaintiff Johnson an apology letter. (Pls.' Compl. ¶ 18.)

## IV. THE *ROOKER–FELDMAN* DOCTRINE

This Court will first address the Defendants' argument that Plaintiffs' claims should be dismissed for lack of subject matter jurisdiction under the *Rooker–Feldman* doctrine. Plaintiffs' second amended complaint is barred by the *Rooker–Feldman* doctrine because the issues raised by Plaintiffs in this litigation are inextricably intertwined with the issues previously decided by the juvenile court.

### A. The Basis of the *Rooker–Feldman* Doctrine

The *Rooker–Feldman* doctrine is derived from two United States Supreme Court decisions. *See Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). In *Rooker,* a dissatisfied plaintiff sued in federal district court alleging that the state court, in a case to which he was a party, rendered an incorrect decision due to an unconstitutional state statute. 263 U.S. at 415, 44 S.Ct. at 150. The Supreme Court held that the jurisdiction of federal district courts is original, and once the state court renders a decision, only the United States Supreme Court can reverse or modify that judgment. *Rooker,* 263 U.S. at 415–416, 44 S.Ct. at 150. The Court emphasized that "[t]o do so would be an exercise of appellate jurisdiction." *Rooker,* 263 U.S. at 416, 44 S.Ct. at 150.

In *Feldman,* the plaintiffs petitioned to the District of Columbia Court of Appeals for a waiver of a bar admission rule. 460 U.S. at 466, 103 S.Ct. at 1306. The Court of Appeals denied their petitions and the plaintiffs filed a complaint in federal district court alleging this denial was unconstitutional. *Feldman,* 460 U.S. at 473, 103 S.Ct. at 1310. The Supreme Court held that a "United States District Court has no authority to review final judgments of a state court in judicial proceedings." *Feldman,* 460 U.S. at 482, 103 S.Ct. at 1315. However, the district court did have subject matter jurisdiction over a state court's nonjudicial action in which the plaintiffs alleged a general attack on the constitutionality of a rule. *Feldman,* 460 U.S. at 476, 477, 103 S.Ct. at 1311, 1312.

"The essence of the *Rooker–Feldman* doctrine is that the lower federal courts do not have the authority to review the judgments of the state courts even

when a federal question is presented." *Centres, Inc., v. Town of Brookfield,* 148 F.3d 699, 700 (7th Cir.1998). The Seventh Circuit sets forth the following test: "Whether the injury alleged by the federal plaintiff resulted from the state court judgment itself or is [the alleged claim] distinct from that judgment." *Garry v. Geils,* 82 F.3d 1362, 1365 (7th Cir.1996), *quoted in Long v. Shorebank,* 182 F.3d 548, 555 (7th Cir.1999). If the injury resulted from the state court judgment itself or if the Plaintiff asks the district court to consider collateral attacks on state court judgments the doctrine will apply. *See GASH Assocs. v. Village of Rosemont,* 995 F.2d 726, 727 (7th Cir.1993). "If the injury alleged resulted from the state court judgment itself, the *Rooker–Feldman* doctrine dictates that the federal courts lack subject matter jurisdiction, even if the state court judgment was erroneous or unconstitutional." *Centres,* 148 F.3d at 702, *quoted in Long v. Shorebank,* 182 F.3d 548, 555 (7th Cir.1999).

▆▆▆▆ The *Rooker–Feldman* doctrine extends beyond issues actually raised in state court to issues that are "inextricably intertwined" with the state court judgment. *Feldman,* 460 U.S. at 483 n. 16, 103 S.Ct. at 1316 n. 16. The Seventh Circuit noted that there is "no bright line that separates a federal claim that is 'inextricably intertwined' with a state court judgment from a claim that is not so intertwined." *Ritter v. Ross,* 992 F.2d 750, 754 (7th Cir.1993). The "crucial point is whether 'the district court is in essence being called upon to review the state-court judgment.'" *Id.* (quoting *Feldman,* 460 U.S. at 483 n. 16, 103 S.Ct. at 1316 n. 16.). Thus, the claim is inextricably intertwined with the state court judgment if the constitutional claim asks the district court to "assume appellate jurisdiction over the state court judgment." *Id.* However, "an issue cannot be inextricably intertwined with a state court judgement if the plaintiff did not have a reasonable opportunity to raise the issue in state court proceedings." *Long v. Shorebank,* 182 F.3d 548, 557 (7th Cir.1999).

## B. The Applicability of the *Rooker–Feldman* Doctrine

Plaintiffs argue that the Defendants violated their rights in three different ways: 1) by placing the minors with an unfit foster parent; 2) by failing to provide the minors with basic medical care; and 3) by retaliating against Plaintiff Johnson. Each of Plaintiffs' claims is inextricably intertwined with the merits of the juvenile court's proceedings. Defendants argue that if it were not for the juvenile court's decision to keep Jamir and Jamal with their natural mother or her family, we would not be here today. This Court agrees. Plaintiffs' claims cannot be considered separate from the ongoing juvenile court orders which involved determinations that the minors were abused, that temporary custody should be given to DCFS, and that the minors should be returned to their mother under an order of protection. Plaintiffs' claims are also not separate from the adjudication of Plaintiff Johnson's visitation rights and the ultimate decision giving Plaintiff Johnson custody.

This conclusion is compelled by Seventh Circuit case law. *Young v. Murphy,* 90 F.3d 1225 (7th Cir.1996). In *Young,* the plaintiff brought a § 1983 claim alleging that the judgment by an Illinois state court that the plaintiff's client was incompetent violated due process. *Id.* at 1231. The Seventh Circuit found that the complaint alleged injury which resulted from the state court judgment and not from the alleged denial of due process. The court emphasized that, had the plaintiff prevailed at the initial state hearing which declared his client incompetent, he would have had no injury and no constitutional claim to bring before the federal district court. *Id.* The Seventh Circuit explained that "Young had several courses available" through which he could have "appealed the adjudication directly to the Appellate Court of Illinois, alleging the procedural defects he presents here" and, consequently, concluded that the plaintiff was really claiming injury from the judgment rather

than the due process afforded by Illinois probate courts. *Id.*

Also on point is *Telford v. Kuhn*, No. 96 C 7309, 1999 WL 169409 (N.D.Ill. Mar.19, 1999). *Telford* stems from a state court custody matter in which the plaintiff's ex-wife was granted custody of their child. *Id.* at *1. After the state court custody order, plaintiff sued the DCFS caseworkers claiming they denied him "liberty" and "associational" interests. The district court applied the *Rooker–Feldman* doctrine because the plaintiff was essentially attacking the state court's custody judgment over which he was dissatisfied. The court noted that if the plaintiff had been granted custody he would not be suing in federal court. To the extent that the *Telford* plaintiff claimed defendants' actions were the cause of destroying his parent-child relationship, the district court reasoned that either the issue was raised during state court proceedings or the plaintiff should have known to raise these issues during the state court proceedings.[6]

### 1. Right to Suitable Foster Care Placement

■ Plaintiffs allege injury directly from Defendants' placement decisions. Plaintiffs' claim concerning the minors' due process right to suitable foster care placement asks this Court to engage in an impermissible review of the juvenile court's custody orders and is precluded by the *Rooker–Feldman* doctrine. Plaintiff Johnson claims the minors were abused when Defendants acted in an unconstitutional manner in deciding where the minors should be placed. For instance, he claims Defendants violated the minors' due process right to suitable foster care placement when the Defendants placed the minors with their mentally ill maternal grandmother. He argues Defendants were aware of Foster Parent's mental illness and were aware that, due to her

illness, she would release the minors back to their mother and the mother's live-in boyfriend. However, the record indicates that in November of 1995, six months after placement with Foster Parent, the juvenile state court ultimately ordered custody back to the minors' mother. Thus it is unclear when the minors suffered abuse by the live-in boyfriend—whether it was at the time they were in temporary custody of the Defendants or when they were under court orders to be with their mother. In both cases, the juvenile court ordered the placement of the minors. Plaintiffs are now asking this Court to review the juvenile court's custody decisions and to decide if the decisions were handled in an unconstitutional manner. Similar to *Young*, had Plaintiff Johnson been given custody at the initial hearing which granted DCFS custody, he would have suffered no injury and had no constitutional claim to bring before this federal district court.

Moreover, Plaintiff Johnson was a party to the juvenile court proceedings with the assistance of counsel. For instance, in October of 1995, Plaintiff Johnson objected to the living arrangement with Foster Parent but later, on November 17, 1995, the juvenile court determined that the minors' mother, not Plaintiff Johnson, was a fit and willing parent to care for and protect the minors. Thus Plaintiff was informed of and participated in the court hearings leading to the placement decisions. He could have appealed these placement decisions and alleged the denial of constitutional rights within the state court system. Therefore, Plaintiffs' claim concerning the minors' right to suitable foster care placement is intertwined with the juvenile court judgment and is precluded by the *Rooker–Feldman* doctrine.

### 2. Right to Basic Medical Care

■ Plaintiffs' complaint also alleges that Defendants failed to provide basic

---

**6.** In *Telford,* the district court stated "it [was] not clear why testimony did not trigger any constitutional violations then but (allegedly) does now. The inescapable conclusion is that plaintiff should have raised any constitutional issues regarding defendants allegedly improper involvement with the plaintiff's relationship with his child during the state court proceedings." No. 96 C 7309, 1999 WL 169409 (N.D.Ill.).

medical care to the minors while they were in state custody. This claim also asks this Court to review the juvenile court's custody orders and is thus inextricably intertwined with the juvenile court's proceedings and is precluded by the *Rooker–Feldman* doctrine.

For example, Plaintiff Johnson claims the minors were neglected when in Foster Parent's care because she was unable to provide proper care. As the Court sees it, medical neglect automatically translates to a poor placement decision. There are certain core principles that create an appropriate placement: food, shelter, medical care, and supervision. A challenge as to any one of these core principles is a challenge to the juvenile court's decision regarding placement. As noted, the juvenile court placed the minors in temporary custody with the DCFS. By bringing claims that the Defendants failed to provide basic medical care, Plaintiffs are indirectly seeking review of the placement decisions. Plaintiffs assert in their complaint that it is because of the Defendants' placement decision that the minors were abused.

In addition, Plaintiffs argue that the Defendants themselves failed to provide necessary medical care. Again this is a collateral attack of the state court's custody judgment and is precluded by the *Rooker–Feldman* doctrine. As in *Telford,* these issues of neglect should have been raised during the state court proceedings. Plaintiff Johnson was a party to the juvenile court case, and with the assistance of counsel participated in the court proceedings. He was even the subject of an order that imposed conditions relating to the minors' medical care. Furthermore, he was aware of the conditions imposed on the minors' mother, including the condition that she ensure that the minors attend regular appointments with a pediatrician. In addition to the juvenile court's conditions, Plaintiff Johnson's attorney received a letter from Evanston Hospital regarding minor Jamir's medical care as early as November 10, 1995. However, on December 22, 1995, Plaintiff Johnson chose to bring up only some of his concerns, only those regarding his visitation rights, which ultimately were adjudicated, and not the issues of medical neglect. In sum, claims regarding Defendants' failure to provide basic medical care to the minors cannot be separated from the juvenile court proceedings. Plaintiff Johnson had a reasonable opportunity to bring up these issues and therefore they are inextricably intertwined with the juvenile court's judgments.

### 3. Retaliation

In addition to Plaintiffs' claims that the Defendants' violated the minors' due process rights to suitable foster care placement and basic medical care, allegations of injuries resulting from acts of possible retaliation are not independent from the juvenile court's placement decision, and are therefore inextricably intertwined with the juvenile court determinations. Thus Plaintiffs' claim of retaliation is precluded by the *Rooker–Feldman* doctrine. Plaintiffs' complaint purports to allege a retaliation claim stating that Defendants retaliated against Plaintiff Johnson after he wrote to Senator Carol Moseley–Braun's office to complain about DCFS. Plaintiffs argue that their retaliation claim is not precluded by the *Rooker–Feldman* doctrine since the retaliation occurred after Plaintiff Johnson was awarded custody and after the juvenile proceeding had concluded. However, the facts, as Plaintiffs present them, suggest that, according to Plaintiffs, Defendants retaliated against Plaintiff Johnson during the state court proceedings. For example, Plaintiff Johnson's pleadings allege that after the letter was sent to the Senator, before he was awarded custody, Defendants retaliated against him by asking him to complete counseling services which he already completed and by making numerous visits to his residence. Plaintiffs also attempt to support their retaliation claim by indicating how the Defendants disregarded concerns of abuse and an unstable environment because Defendants thought Plaintiff Johnson was just a "jealous" parent. Similar to the testimony in the *Telford* case

which should have triggered the plaintiff's "liberty complaints", these allegations suggest Plaintiff Johnson suspected before the juvenile court proceedings ended that Defendants had been retaliating against him and should have raised the claim in that proceeding.

In addition to this awareness which should have led to Plaintiff Johnson raising this issue of retaliation during the juvenile state court proceedings, it appears that the injury caused by Defendants' alleged acts of retaliation is the injury resulting from the juvenile state court judgment. Plaintiff Johnson indicates that due to Defendants' acts of retaliation, his children were not placed with him soon enough and thus left in an unsafe environment. As noted, Plaintiff Johnson was a party to the state court proceedings and he should have raised in the juvenile court any problems regarding delay in placement due to retaliation. These alleged acts of retaliation cannot be separated from Defendants choice of placement and are therefore intertwined with the state court judgment.

## C. Plaintiffs Had Reasonable Opportunity to Raise Claims in State Court

Plaintiffs argue that their claims are not inextricably intertwined since they did not have a reasonable opportunity to present these claims in state court. They argue that their claims did not materialize until after Plaintiff Johnson received custody and after the juvenile state court proceedings had ended. Specifically Plaintiffs argue that Defendants intentionally misrepresented and concealed facts from both himself and the juvenile courts regarding placement and ongoing care. Plaintiff Johnson argues it is only because he had no knowledge that he did not raise these claims in state court. Thus the issue becomes whether or not Plaintiffs had a reasonable opportunity to raise their claims during the juvenile state court proceedings. This Court concludes that Plaintiffs did have a reasonable opportunity to raise their claims during the juvenile court pro-

ceedings and holds they are precluded by the *Rooker–Feldman* doctrine.

The Seventh Circuit recently emphasized that "[b]ecause the *Rooker–Feldman* doctrine extends beyond issues actually raised in state court . . . an issue cannot be inextricably intertwined with a state court judgment if the plaintiff did not have a 'reasonable opportunity' to raise the issue in state court proceedings." *Long v. Shorebank*, 182 F.3d 548, 557 (7th Cir.1999). In analyzing what situations afford a reasonable opportunity the Seventh Circuit noted it is not enough for the plaintiff to rely on the deception of her opponents. *Id.* Rather, a lack of opportunity to raise a claim in state court usually involves cases when "the federal litigants have pointed to some factor independent of the actions of the opposing party." *Id.* at 558. Specifically, the courts have found that the federal plaintiff has no reasonable opportunity when either "some action taken by the state court or state court procedures form barriers that the litigants are incapable of overcoming in order to present certain claims to the state court." *Id.* This issue was specifically illustrated in *Long*. The court reasoned that although the plaintiff could not rely upon the defendants' deception, no reasonable opportunity existed because the defendants created the injury by "instituting a forcible entry and detainer action" against the plaintiff. *Id.* at 558. Thus the court concluded that the *Rooker–Feldman* doctrine did not preclude the plaintiff from bringing her claims in federal court because she did not have a reasonable opportunity to raise her claims in state court. *Id.* at 558.

Unlike *Long,* in which the court found that Illinois law effectively precluded the plaintiffs from raising state claims, there is nothing in the record that illustrates how the state court prevented Plaintiff Johnson from raising his claims regarding denial of the minors' right to suitable foster care placement, denial of the minors' right to basic medical care, and retaliation. Plaintiff Johnson urges

that he did not raise his claims in state court because he was both unaware and intentionally misled by the Defendants' actions until after the juvenile case was closed. However, as *Long* points out, deception is not enough to claim there was not a reasonable opportunity to raise issues during a state court proceeding. As noted, Plaintiff Johnson was a party represented by counsel during the juvenile court proceedings. He received letters during the state court proceedings informing him about the minors' medical treatment and had knowledge of the juvenile court orders concerning their medical care. He was also aware of the orders placing the minors with Foster Parent. Since he was an involved participant in the juvenile court, any concerns regarding these orders should have been raised at that time. Moreover, as Defendants point out, Plaintiffs' claim of "lack of knowledge is not entirely accurate." Plaintiff Johnson did have knowledge of potential negligence during the juvenile proceedings since Plaintiff Johnson chose to bring many of his concerns through the Inspector General's office before he filed this lawsuit. To conclude, Plaintiffs did have a reasonable opportunity to bring up their claims in state court, and their claims are therefore precluded by the *Rooker–Feldman* doctrine.

## V. QUALIFIED IMMUNITY DEFENSE

Even though Plaintiffs' claims are barred by the *Rooker–Feldman* doctrine, the Court will address the Defendants' qualified immunity defense in the interest of judicial economy. The qualified immunity analysis also includes the question of whether Plaintiffs have stated a claim for relief. As previously noted, Plaintiffs purport to allege claims for a denial of the minors' due process right to suitable foster care placement, a denial of the minors' right to basic medical care while in state custody, and retaliation against Plaintiff Johnson for attempting to redress his grievances. For the reasons stated below, qualified immunity does not constitute a defense to the two due process claims for

the period of June 27, 1995 though November 17, 1995, but does constitute a defense to the retaliation claim.

The defense of qualified immunity protects from liability for civil damages government officials who perform discretionary functions unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The qualified immunity determination requires a two step analysis: (1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question? *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir.1994); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 1714, 140 L.Ed.2d 1043 (1998) (in resolving cases in which the defense of qualified immunity is raised, courts should first determine whether the plaintiff has alleged a deprivation of a constitutional right at all). The plaintiff bears the burden of establishing the existence of a clearly established constitutional right. *Kernats*, 35 F.3d at 1176.

### A. *DeShaney* Does Not Preclude Defendants' Liability

Defendants rely upon *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) and Seventh Circuit case law for their qualified immunity defense. *DeShaney* stands for the proposition that the state generally has no duty to protect a child against private violence while in her parent's control. However, the state does owe a duty of protection to individuals held in state custody. *DeShaney* does preclude the Defendants' liability for the minors' injuries sustained between November 17, 1995 and June 13, 1996, because during that period the minors' natural mother, not the state, had legal custody. However, because the state retained legal custody of the minors from June 23, 1995 to Novem-

ber 17, 1995, *DeShaney* is not a complete bar to the Defendants' liability.

*DeShaney* is the leading case defining government liability under the United States Constitution for acts committed against individuals by private actors. *See Stevens v. Umsted,* 131 F.3d 697, 701 (7th Cir.1997). In *DeShaney,* a child and his mother brought a § 1983 action against state caseworkers, alleging that the caseworkers had violated the child's right to substantive due process by failing to protect him from his father's violence. 489 U.S. at 191, 109 S.Ct. at 1001. The Supreme Court held that the Due Process Clause imposes no affirmative duty on the state to protect against private violence. *DeShaney,* 489 U.S. at 203, 109 S.Ct. at 1007. "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney,* 489 U.S. at 195, 109 S.Ct. at 1002. The Court concluded: "[a]sa general matter ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney,* 489 U.S. at 197, 109 S.Ct. at 1004.

Relying on the general "no duty to protect" rule outlined in *DeShaney,* the Defendants cite *Doe ex rel. Nelson v. Milwaukee County,* 903 F.2d 499 (7th Cir. 1990); *Losinski v. County of Trempealeau,* 946 F.2d 544 (7th Cir.1991); and *Bank of Illinois v. Over,* 65 F.3d 76 (7th Cir.1995). In *Doe,* the Department of Social Services caseworkers were not held liable under § 1983 because due process does not require them to protect a child against abuse inflicted by his mother and her live-in boyfriend. 903 F.2d at 499. In *Losinski,* a deputy sheriff did not violate a woman's due process rights when he failed to prevent her ex-husband from killing her. 946 F.2d at 551. The Seventh Circuit in *Over* held Department of Children and Family Services caseworkers not liable for not preventing a child from being beaten by the teenage son of the father's lover while in the temporary legal custody of the mother. 65 F.3d at 76. However,

unlike *Doe, Losinski,* and *Over,* the state in this case had legal custody of the minors from June 23, 1995 until November 17, 1995. As the *DeShaney* opinion demonstrates, the state assumes at least a limited obligation of care and protection for individuals held in state custody. *See, e.g.,* 489 U.S. at 198–201, 109 S.Ct. at 1004–05.

 The Supreme Court in *DeShaney* recognized two exceptions to the general "no duty to protect" rule: the "custody" exception and the "state created danger" exception. *Id.* For present purposes, only the "custody" exception requires the Court's attention. "[I]n certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." 489 U.S. at 198, 109 S.Ct. at 1004. This affirmative state duty already applies in the incarceration and institutionalization contexts. The Eighth Amendment's prohibition against cruel and unusual punishment requires the State to provide adequate medical care to incarcerated prisoners. *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976). The substantive component of the due process clause requires the State to provide involuntarily committed mental patients with those services necessary to ensure their "reasonable safety." *Youngberg v. Romeo,* 457 U.S. 307, 314–25, 102 S.Ct. 2452, 2457–63, 73 L.Ed.2d 28 (1982). With *Estelle* and *Youngberg* in mind, the Court in *DeShaney* stated: "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." 489 U.S. at 199–200, 109 S.Ct. at 1005. The Court went on to suggest that this duty might apply in the caseworker-foster child context as well: "[h]ad the State by the affirmative exercise of its power removed [the child] from free society and placed him in a foster home operated by its agents, we might have a situation suf-

ficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9, 103 L.Ed.2d 249; *see also Stevens v. Umsted*, 131 F.3d 697, 702 (7th Cir.1997) (quoting same).

## B. Qualified Immunity Doctrine Applied

 As noted, a state official is entitled to qualified immunity unless the plaintiff alleges the deprivation of a constitutional right, a right that was "clearly established" when the state official's conduct occurred. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir.1994); *Taahira W. ex rel. McCord–Salley v. Travis*, 908 F.Supp. 533, 542 (N.D.Ill.1995). The plaintiff bears the burden of establishing the existence of a clearly established constitutional right. *Id.* A plaintiff may show that a legal rule was "clearly established" either by providing a "closely analogous" case covering both the right at issue and its application to the facts of the case at hand, or by showing that a reasonable person would have known that he was violating the law because such violation was so obvious. *Vickery v. Jones*, 100 F.3d 1334, 1339 (7th Cir.1996). The plaintiff need not direct the Court to a case that is "precisely on all fours on the facts and law involved here." *Landstrom v. Illinois Dep't of Children and Family Servs.*, 892 F.2d 670, 676 (7th Cir.1990). Once the defendant's actions are defined or characterized according to the specific facts of the case, this characterization is compared to the body of law existing at the time of the alleged violation, in order to determine whether the actions violated "clearly established" law. *Id.* at 675. What is required is a "sufficient consensus," based on all relevant case law, indicating that the official's conduct was unlawful. *Id.* at 676.

### 1. Right to Suitable Foster Care Placement

Plaintiffs claim Defendants violated the minors' substantive due process right to suitable foster care placement when De-

fendants placed the minors in the temporary custody of Foster Parent on June 27, 1995 and continued placement with her through November 17, 1995. According to Plaintiffs, Defendants knew Foster Parent was mentally unstable and unable to care for the children. By knowingly placing the minors with an unfit foster parent Defendants violated the substantive component of the due process clause and thus subjected themselves to liability under § 1983. Defendants' qualified immunity defense fails with respect to this first claim because Plaintiffs' have carried their burden of demonstrating that the minors do have a constitutional right to suitable foster care placement, and that the right was clearly established on June 27, 1995 when Defendants placed the minors with Foster Parent. *See Taahira*, 908 F.Supp. at 542.

 First, Plaintiffs have alleged the violation of a constitutional right. Children in state custody have a constitutional right not to be placed with a dangerous or otherwise unfit foster parent. *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 853 (7th Cir.1990). In *K.H.*, a child brought a § 1983 action against DCFS caseworkers after she had been sexually abused by a foster parent while in state custody. *Id.* at 848. The foster parent lacked both the training and ability needed to care for this emotionally disturbed child. *Id.* "[I]f without justification based either on financial constraints or on considerations of professional judgment [child welfare workers] place [a] child in hands they know to be dangerous or otherwise unfit ... they expose themselves to liability in damages. This right we regard as clearly established." *Id.* at 854. "There is, made explicit by this opinion but clearly implicit in *Youngberg*, a prima facie right not to be placed with a foster parent who the state's caseworkers and supervisors know or suspect is likely to abuse or neglect the foster child." *Id.* at 853. In *Youngberg*, decided eight years before *K.H.*, the Supreme Court held that the state has an affirmative duty to reasonably ensure the well-

being of individuals committed to its state mental institutions. 457 U.S. at 315, 102 S.Ct. at 2458. "The mere fact that [the child] has been committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment." *Id.*

■ The right to suitable foster care placement is not a novel one. The right to suitable foster care placement also includes the right to adequate supervision. *Camp v. Gregory*, 67 F.3d 1286, 1294 (7th Cir.1995). In *Camp*, an aunt brought a § 1983 action on behalf of her nephew seeking damages for injuries the nephew allegedly endured as a result of a DCFS caseworker's foster care placement decision. *Id.* Once the state had assumed guardianship of the nephew, the Juvenile Court recommended that he be placed in a highly structured foster care environment. *Id.* at 1288. The aunt claimed that the eventual harm [7] to the nephew was a direct result of the caseworker's failure to place him in the highly structured environment he needed. *Id.* While the court imposed no liability, allowing the defendant to invoke the qualified immunity defense, it observed that "a child placed in the guardianship of the state has a due process right not to be placed by the state with a custodian whom the state knows will fail to exercise the requisite degree of supervision over the child." *Id.* at 1294. "Consistent with our analysis in *K.H.*, cases from our sister circuits also recognize that public officials may be held liable for damages when they place a child in a foster home knowing or having reason to know that the child is likely to suffer harm there." *Id.* at 1293.

■ The right to suitable foster care placement also includes the right to be placed in a safe environment. In *Young-*

*berg*, the Supreme Court held that the state must ensure the safety of all residents and personnel in its institutions. 457 U.S. at 324, 102 S.Ct. at 2462. "If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed ... in unsafe conditions." 457 U.S. at 316, 102 S.Ct. at 2458 This right to physical safety has been recognized in the foster care placement context as well. As the *K.H.* court noted, the state, having removed a child from her parents' custody, assumes at least a limited responsibility under the Constitution for her safety. 914 F.2d at 849. The state cannot avoid this duty merely by substituting private for public custodians. *Id.* at 852. There exists, then, in this and several other circuits, a clearly established substantive due process right to suitable foster care placement, which includes the right to adequate supervision and physical safety.

■ Plaintiffs' complaint sets forth a claim that Defendants violated the minors right to placement with a suitable foster parent as outlined in *K.H.* According to Plaintiffs, Defendants placed the minors in the care of Foster Parent knowing she was mentally unstable and unable to care for the minors based on professional judgments of her mental status. Defendant Mannie decided to continue placement with Foster Parent despite opposition from family members, the doctor of one of the minors, and Foster Parent's own psychiatrist. At some point between June and November of 1995, Foster Parent had an emotional breakdown and was admitted to a psychiatric ward. Upon her admittance to the psychiatric ward, Foster Parent released the minors to the biological mother

---

7. This suit was filed shortly after the nephew had been killed. His death occurred two blocks from the foster parent's home, but the precise circumstances of his death were not clear when the court decided the case. *Camp*, 67 F.3d at 1291. The court noted that it was reasonable to assume that the nephew's death occurred outside the foster home at the hands of someone other than a family member. *Id.* The essence of the aunt's claim is not that the foster parent or someone else in the foster household posed a danger to the nephew, but that the foster parent was unable to protect him from dangers posed by others. *Id.*

and live-in boyfriend, which Defendants knew was unacceptable given that the state had just recently removed the minors from the mother's care. Similar to *K.H.*, Foster Parent appears to have been woefully lacking in the training and ability needed to care for these children. *See* 914 F.2d at 848. Moreover, given her emotional and psychological challenges, it is seriously doubted that she was capable of exercising the requisite degree of supervision over the minors and ensuring their safety. Accordingly, the complaint sufficiently avers that Defendants failed to exercise appropriate professional judgment in placing the minors with Foster Parent. Thus, the first prong of the qualified immunity test is satisfied.

The second prong of the *Kernats* qualified immunity test is likewise satisfied because the right to suitable foster care placement was "clearly established" in *K.H. ex rel. Murphy v. Morgan* in 1990, years before Defendants in this case placed the minors with Foster Parent.

## 2. Right to Basic Medical Care

Plaintiffs claim Defendants violated the minors' substantive due process right to receive basic medical care while in state custody from June 27, 1995 through June 8, 1996. Plaintiffs assert that the minors received no medical or dental care during this period. Defendants' qualified immunity defense fails with respect to this claim from June 27, 1995 to November 17, 1995 because minor children in state custody do have a substantive due process right to basic medical treatment, the right having been clearly established by June 27, 1995.

First, under the *Kernats* qualified immunity analysis, Plaintiffs have alleged a deprivation of a constitutional right. In *Youngberg*, the Supreme Court held that the state must provide certain basic services to individuals committed to its institutions. 457 U.S. at 324, 102 S.Ct. at 2462. "When a person is in state custody she is wholly dependent on the State, and a duty to provide certain services and care does exist." *Id.* Indeed, the State in *Youngberg* conceded that it had a duty to provide adequate food, shelter, clothing, and *medical care* to those committed to its care. 457 U.S. at 315, 102 S.Ct. at 2457. The Court observed: "these are the essentials of the care that the State must provide." 457 U.S. at 324, 102 S.Ct. at 2462. Speaking of *Youngberg*, the Seventh Circuit in *K.H.* noted that the Constitution requires the responsible state officials to take steps to prevent children in state institutions from deteriorating physically or psychologically. Moreover, in the court's view, "*Youngberg* made the basic duty of the state to children in state custody clear, and *Doe* added the obvious corollary that the duty could not be avoided by substituting private for public custodians." *K.H.*, 914 F.2d at 852; *see also Doe v. New York City Dep't of Soc. Servs.*, 649 F.2d 134, 144 (2d Cir.1981) (noting that a placement agency may be held liable under § 1983 for exhibiting deliberate indifference to a known injury or known risk to a foster child).

 The complaint sets forth a claim that Defendants failed to ensure the minors received proper medical care. One of the most basic constitutional guarantees while in state custody is the right to adequate medical care. *See Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462. Here, doctors reported that the minors had been medically neglected while wards of and under the protection of the State. Under *Youngberg* and *K.H.*, child welfare workers must prevent these children from "deteriorating physically and psychologically." *K.H.*, 914 F.2d at 851. *Doe* demonstrates that the basic duty of the state to children in state custody is not diminished when private custodians are used. 649 F.2d at 144. "No case held the contrary and there was no reason to think that *Doe* would not be followed in this circuit." *K.H.*, 914 F.2d at 852. Thus, there exists a clearly established constitutional right to receive reasonable medical care while in state custody.

Turning to the second prong under *Kernats*, the right to reasonable medical care

while in state custody was clearly established in June of 1995. *Youngberg,* decided thirteen years before Defendants' inaction here, leaves no doubt that the state must provide certain basic services to individuals held in state custody, among them: food, shelter, clothing and medical care. Defendants' qualified immunity defense thus fails during the period of June 27 through November 17, 1995 with respect to this second claim.

### 3. Retaliation

Plaintiffs also purport to allege a claim for retaliation against Defendants. "To state a cause of action for retaliatory treatment, a complaint need only 'allege a chronology of events from which retaliation may be inferred.'" *Black v. Lane,* 22 F.3d 1395, 1399 (7th Cir.1994). This chronology of events must include an action which changed for the worse the conditions experienced by the plaintiff. *Benson v. Cady,* 761 F.2d 335, 342 (7th Cir.1985). Moreover, alleging merely the ultimate fact of retaliation is insufficient. *Id.* The court in *Benson* concluded that the plaintiff in that case had not experienced the worsened condition required for a retaliation claim. *Id.* at 342. The plaintiff had been transferred from one correctional institution to another. *Id.* He claimed the evidence of retaliation was his transfer back to a double cell at the first institution. *Id.* However, the court noted that plaintiff had not been assigned to a single cell in the first place. *Id.* The court did go on to suggest that a move from a double to a single cell would be a worsened condition for purposes of a retaliation claim. *Id.* In *Black,* the Seventh Circuit held that the plaintiff had stated a claim for retaliation. *Id.* at 1400. "Reviewing the actions of the various defendants ... it is evident that Black has alleged continuous acts of harassment and beatings since the time he filed an administrative complaint with the Department of Justice." *Id.* at 1399. However, Plaintiffs in this case fail to allege a chronology of events from which retaliation can be inferred. In particular, the Plaintiff Johnson has experienced no

worsened condition. *See Benson,* 761 F.2d at 342. Plaintiff Johnson alleged that DCFS employees conducted searches and inspections of his home at inconvenient times. He also alleges that Defendants attempted to make him complete counseling services he had already completed. However, even if true, these allegations do not rise to the level of a worsened condition as set forth in *Benson* and *Black* in order to maintain a claim for retaliation. Thus, Plaintiffs fail the first prong of the *Kernats* test in that they have failed to state a claim for retaliation and, consequently, have failed to allege a constitutional violation.

For the reasons stated above, the Court would have denied Defendants' qualified immunity defenses with respect to Plaintiffs' two due process claims for the period of June 27 through November 17, 1995, and granted Defendants' qualified immunity defense with respect to Plaintiffs' retaliation claim.

## VI. CONCLUSION

Because the Plaintiffs had a previous opportunity to raise the issues before this Court in state court and because Plaintiffs' federal claims are inextricably intertwined with the issues previously decided by the juvenile court, federal jurisdiction is barred by the *Rooker–Feldman* doctrine. **Consequently, the Court grants Defendants' motion to dismiss for lack of subject matter jurisdiction.**

**SO ORDERED.**